## STATE v. HENRY G. BENNETT et al.

No. A-10509.   Oct. 11, 1945.

(162 P. 2d 581.)

Randell S. Cobb, Atty. Gen., E. J. Broaddus, Asst. Atty. Gen., and Dixie Gilmer, Co. Atty., and M. S. Simms and John L. Ward, Jr., Asst. Co. Attys., all of Tulsa, for plaintiff in error.

Swank & Swank, John Monk, and W. Hendrix Wolf, all of Stillwater, F. A. Rittenhouse and Blakeney & Blakeney, all of Oklahoma City, Welch & Welch, of Madill, and Ownby & Warren, of Tulsa, for Henry G. Bennett, defendant in error.

Hudson & Hudson, of Tulsa, for Willis L. Smith, defendant in error.

Harley Ivy, of Waurika, for J. T. Daniel, defendant in error.

Busby, Harrell & Trice, of Ada, and Chas. E. McPherren, of Oklahoma City, for A. L. Crable, defendant in error.

F. A. Rittenhouse, of Oklahoma City, for Ed Morrison, defendant in error.

LOONEY, Special J. This case comes here on appeal by the state from an order and judgment of the district court of Tulsa county sustaining separate motions of defendants to quash and set aside an indictment for conspiracy.

The indictment herein is an outgrowth of certain textbook adoptions by the Oklahoma Textbook Commission in the year 1937. Among those indicted were Ed Morrision, O. E. Shaw, J. E. Perry, members of the Text-

book Commission, Willis Smith, owner and manager of the School Book Depository, J. T. Daniel, Speaker of the Oklahoma House of Representatives for the 1937 Legislative Session, A. L. Crable, Superintendent of Public Instruction and Secretary of the Textbook Commission, Henry G. Bennett, President of Oklahoma A & M College, who was co-author of one of the textbooks that were adopted, and Howard B. Drake, an alleged patronage dispenser of the then Governor of the State of Oklahoma.

The indictment charges among other things that in the year 1937 defendants conspired to control the adoption of textbooks by the Oklahoma Textbook Commission; to obtain the adoption of certain school books at excessive prices; to secure the execution of contracts for the publication of such books in the State of Oklahoma for the purpose of repaying to certain school book companies moneys which said companies had advanced to defendants Drake and Daniel prior to the proposed adoption.

The learned trial judge at the conclusion of a lengthy hearing of the evidence offered by both the state and defendants on the motion to quash the indictment correctly summarized the indictment and evidence as follows:

"The court analyzes this indictment by saying that according to the indictment there were five objects and purposes of the conspiracy. First, that they would control the adoption of textbooks by the Oklahoma Textbook Commission; Second, that they would destroy competition in two fields, first, in the securing of textbooks, and second, in the making of contracts; the third purpose, that they would demand and receive large sums of money in consideration of the adoption of textbooks and the securing of the contracts; fourth, that they would defraud the State of Oklahoma thereby of large sums of

money in securing and consummating the purchase by the state on the order of the Superintendent of Public Instruction, through the State Welfare Department, of large quantities of books; fifth, that the contracts thus secured would provide for a purchase price of the textbooks in an excessive amount, in order to reimburse the coconspirators for large sums of money expended in connection with the alleged conspiracy; and, finally, as a result of these five purposes, the school children and school patrons of the State of Oklahoma, including the county of Tulsa and all other counties of the state, would thereby be cheated and defrauded, the last being a result alleged in the indictment, rather than a purpose for which the alleged conspiracy was formed.

"Now, then, there are two defendants in this conspiracy case, J. E. Perry and O. E. Shaw, who did not file their motions to quash. We will not discuss this case in so far as those two defendants are concerned, because they are not now involved in these proceedings. They filed demurrers instead of motions to quash and those demurrers have not yet been heard.

"First, with reference to the defendant Ed Morrison, was there evidence in this case sufficient for the grand jury to return an indictment against Ed Morrison as a member of an alleged band of conspirators?

"He was a member of the Textbook Commission who voted, according to the evidence before the grand jury, for the adoption of textbooks and the granting of contracts, when he knew there had been graft and corruption in connection therewith.

"There was no evidence before the grand jury which showed that any of this money came into his hands, but certainly on a motion to quash the indictment, this court is not going to absolve a defendant from blame when he, occupying a position of public trust, approved, by his acts and his deeds, transactions which he himself had been advised and knows have been contaminated by fraud and graft.

"There was evidence in this case sufficient to indict the defendant Ed Morrison, and when we consider the evidence in so far as Daniel, Drake and Crable are concerned, there can be no question but that the grand jury had ample evidence to say by their indictment that these men were the arch conspirators of an unlawful and vicious scheme, contaminated from top to bottom by graft and corruption. By their own testimony before the grand jury, this situation was disclosed.

"Drake and Daniel testified with regard to the receipt as pure political graft, thousands upon thousands of dollars, and Crable, Superintendent of Public Instruction for the State of Oklahoma, under the evidence before the grand jury, was the man who activated the program and he was the man without whom this situation could not have existed, had he not given it his complete support and been a part thereof."

"I hesitate to go further in the analysis of the evidence regarding that feature of the case, because it is so rank and so devoid of propriety that the grand jury in their indictment, and under the evidence before them was amply justified in finding this alleged unlawful conspiracy to have existed, and it indicates a complete unfitness and lack of character on the part of these individuals.

"As to the defendant, Henry G. Bennett, the evidence in this case is not sufficient, and was not sufficient to warrant the grand jury to return an indictment against him. I pause here to analyze, briefly, the alleged damaging evidence in this case. It has to do with the revision of the arithmetic. The evidence in this case—I will put it this way—there was no evidence in this case before the grand jury that the defendant, Bennett, revised the textbook, or took any active part therein. The contract between Bennett and the school book company, which was introduced in evidence before the grand jury, discloses that the question of revision of these books, as to whether they should be revised, or not, was in the hands of the publishing company. I have been unable

to find any evidence in this case which shows that Henry G. Bennett took any active part in the conspiracy. I have been unable to find any evidence before the grand jury from which it can be reasonably inferred that he was one of the conspirators, and so that the motion of the defendant, Henry G. Bennett, to quash and set aside the indictment in case No. 11,467, in so far as he is concerned, will be sustained."

"I would like to say this: I kept looking at this indictment a minute ago, when I was talking about Daniel, Drake and Crable, and I could not find the defendant, Willis Smith's name at the moment, and I want to say that all that I have said that impugns the character and motives of Daniel, Drake and Crable, under the evidence before the grand jury, equally and fully applies to the defendant, Willis Smith."

The state contends that certain textbooks were sold in Tulsa county in 1941, 1942, and 1943, pursuant to the 1937 adoptions; that the sale of these textbooks in Tulsa county during those years was an overt act to accomplish the conspiracy allegedly formed by the defendants, and, because of these sales, venue of this prosecution would lie in Tulsa county, and that the three years' statute of limitations would not bar the prosecution of defendants.

The defendants contend that the sales of those textbooks in Tulsa county at the times stated in the indictment were not overt acts to accomplish the conspiracy allegedly formed by the defendants, but were merely acts that were the results of the conspiracy that had already been completed; further, that a new gubernatorial administration took office in January, 1939, and that the 1937 adoptions had been superseded by the adoptions of a new textbook commission in 1939, and that the sales of books thereafter were under the 1939 adoptions by the State Textbook Commission; that, accordingly, the al-

leged offense was barred by the statute of limitations and that since the conspiracy was formed and completed at the State Capitol at Oklahoma City, in Oklahoma county, that venue would not lie in Tulsa county.

It is a well-settled rule that where a trial court hears evidence and passes upon a motion, sustaining or overruling the same, the judgment of the trial court thereon is a discretionary one and will not be disturbed on appeal in the absence of an assignment and a clear showing that the trial court in either overruling or sustaining the motion clearly abused its judicial discretion. Estell v. State, 43 Okla. Cr. 99, 277 P. 256; State v. Bell, 13 Okla. Cr. 664, 166 P. 451; Takarske v. State, 81 Okla. Cr. 189, 162 P. 2d 197.

Since an abuse of discretion is not assigned as error and is not presented in this appeal by the state and no contention is urged that the trial court did abuse its discretion in sustaining the motion to quash because of insufficiency of the evidence as to the defendant, Henry G. Bennett, the trial court's finding as to him is final and the things hereinafter stated in this opinion do not apply to said defendant Bennett, but only apply to the contentions of the state directed to the action of the court in sustaining the motions to quash as to the remaining defendants hereinabove named.

It is unnecessary for us to give a detailed analysis of the evidence, as a careful reading of the record shows that the trial judge, in his statement herein above quoted, clearly summarized the evidence before the grand jury. Nothing further will be stated concerning the proof adduced before the grand jury, as the issues before this court raise purely questions of law concerning the statute of limitations and venue.

We have reviewed the authorities presented by both sides of this case, and have acquainted ourselves with the record.

We are of the opinion that all of the acts charged as a part of the alleged conspiracy occurred in Oklahoma county, Okla., and that all overt acts alleged occurred more than three years prior to the date of the returning of the indictment in Tulsa county. The district court of Tulsa county was without jurisdiction of the alleged offense.

This court has heretofore defined conspiracy as a combination of two or more persons by some concerted action to accomplish some criminal or unlawful purpose, or to accomplish some purpose not in itself criminal, by criminal or unlawful means. Wishard v. State, 5 Okla. Cr. 610, 115 P. 796; Conley v. State, 15 Okla. Cr. 531, 179 P. 480; Burns v. State, 72 Okla. Cr. 432, 117 P. 2d 155.

The charging statute is 21 O. S. 1941 § 424. The overt act which completes the offense under this statute is one which is done to effect the object of the conspiracy. The crime of a conspiracy to commit a felony or misdemeanor is not complete unless some act besides such agreement be done to effect the object thereof by one or more of the parties to such agreement; and that act must be some overt act or acts done in furtherance and pursuance thereof. Williams et al. v. State, 16 Okla. Cr. 217, 182 P. 718, 724.

Where the jurisdiction of the court depends solely upon an overt act alleged in an information or indictment for conspiracy to commit a crime, it must be alleged with definiteness and certainty as any other jurisdictional fact. And it must be alleged and proved that

the overt act was an act done in furtherance and pursuance, and to effect the object of the conspiracy.

In Williams v. State, supra, it is held that an overt act must be something more than evidence of conspiracy. It must be an act done by one of the parties to carry out the intent, and one that would naturally effect that result. It must be a step towards the execution of the conspiracy.

"Under the statute * * *, the crime of conspiracy is not complete without the commission of an overt act. Therefore the overt act may be the sole basis of local jurisdiction. However, it must be something more than evidence of the conspiracy. It must be an act to effect its object." Williams v. State, supra.

In the instant case, the purpose of the alleged conspiracy was to influence the Textbook Commission, so as to bring about the adoption of certain textbooks and obtain contracts therefor. Any overt act under this rule must be one that would "effect" that result. Any act done to influence the Textbook Commission in making the alleged adoptions, or executing the contracts, would be an overt act and a part of the conspiracy. After the adoptions were made and after the contracts were entered into, then the conspiracy no longer existed. Nothing further could be done to help bring it about because it was a thing that had already terminated.

"When a conspiracy is entered into to do an unlawful act, all persons who engage therein are responsible for all that is done in pursuance thereof by any of their co-conspirators until the object for which the conspiracy was entered into was fully accomplished." Holmes v. State, 6 Okla. Cr. 541, 119 P. 430, 435, 120 P. 300.

The Oklahoma conspiracy statute was adopted from the federal statutes. State v. Young, 20 Okla. Cr. 383, 203 P. 484.

A review of the construction placed upon the language of the statute by the federal courts is persuasive and helpful in clarifying the distinction between an act done for the purpose of effecting the object of the conspiracy and the result which occurs after the object of the conspiracy has been accomplished and the conspiracy has ceased to exist.

In the case of United States v. Great Western Sugar Co. et al., D. C., 39 F. 2d 152, 155, it was charged that several concerns did practically all of the beet sugar business in the States of Nebraska, Colorado, Montana and Wyoming, that a price war was carried on between some of these concerns for the purpose of restraining interstate commerce in sugar, and that a conspiracy was formed between the defendant companies to restrain and control interstate trade in beet sugar, contrary to the Anti-Trust Act, 15 U. S. C. A. §§ 1-7, 15.

Prosecution was commenced on information in the United States District Court in the State of Nebraska. None of the acts constituting the alleged conspiracy occurred in that state, nor were any of the acts complained of performed within three years prior to the date of the information, except that it was charged that within that period "and within the county of Dancaster, in the state and district of Nebraska," certain sales and purchases were made at the price which resulted from the alleged conspiracy.

A special demurrer was interposed by the defendants, presenting the issue of limitations. The court sustained the demurrer. The defendants' plea to the jurisdiction was sustained upon substantially the same grounds, it having only been shown that sales and purchases were made in the State of Nebraska. The court

stated that those acts "neither furthered the conspiracy nor manifested it in existence or operation, and therefore the conspiracy is not shown to have come within the territorial jurisdiction of this court." See, also, United States v. Biggs, D. C., 157 F. 264; United States v. Biggs, 211 U. S. 507, 29 S. Ct. 181, 53 L. Ed. 305; United States v. McLaughlin, D. C., 169 F. 302; Lonabaugh v. United States, 8 Cir., 179 F. 476.

There are many decided cases illustrative of this principle. In Rose v. St. Clair, D.C., 28 F. 2d 189, 191, where one Rose, acting in conjunction with a local organization, gave an exhibition in a theatre in Pittsburgh, Virginia, of films of the Tunney-Dempsey prize fight. The films were seized by the United States Marshal under a search warrant and the court ordered the films returned to Rose. Later, an indictment was returned alleging a conspiracy to violate the federal statutes prohibiting the importation and interstate transportation of films, showing a pictorial representation of prize fights. The overt act alleged to have been committed was in publicly exhibiting the films. The court, in holding that the exhibition of the films within the jurisdiction of the court did not constitute an overt act to effect the object of the conspiracy, clearly distinguished between such acts and acts subsequently done that could not have any effect in the formation and existence of the completed conspiracy in the following language:

"In the affidavit the 'object of the conspiracy,' within the meaning of the conspiracy statute, is confused with what may be conveniently called the ultimate purpose of the conspirators. The object of the conspiracy was to violate section 1 of the act of 1912; the ultimate purpose of the conspirators was to publicly exhibit the films in Virginia; and this clear and unavoidable distinction makes necessary the conclusion that the object of the

conspiracy had been fully and completely effected when the interstate transportation of the films had been completed. It also follows that the subsequent exhibition of the films in this city, while it was an act done to effect the ultimate purpose of the conspirators, could not have been an act done "to effect the object of the conspiracy.' When the object of a conspiracy has been fully accomplished, no act subsequently done can possibly be an act done to effect the object of the conspiracy. To speak of an act done after the object in view had been fully accomplished as an act done to effect such object is an absurdity.

"It seems clear that the films were used 'as a means' of giving the exhibition which was being given when the affidavit was made. But Congress has never attempted to forbid the exhibition of pictures of prize fights, and, as the exhibition was not an act done to effect the object of the conspiracy, the use of the films in giving the exhibition is in this case without legal significance. The exhibition was merely an act (not declared to be a crime) done after the object of the conspiracy had been fully accomplished."

See, also, Lorenz v. United States, 24 App. D. C. 337; 387; Id., 196 U. S. 640, 25 S. Ct. 796, 49 L. Ed. 631; Ware .v United States, 154 F. 577, 84 C. C. A. 503, 12 L.R.A., N.S., 1053, 12 Ann. Cas. 233; Id., 207 U. S. 588, 28 S. Ct. 255, 52 L. Ed. 353; Jones v. United States, 162 F. 417, 89 C.C.A. 303; Id., 212 U.S. 576, 29 S. Ct. 685, 53 L. Ed. 657.

When the adoptions were made and the contracts executed, the conspiracy was complete and the overt acts necessary under our statute as an ingredient of a conspiracy had already been performed. The object of the conspiracy had been attained. The alleged conspiracy thereafter ceased to exist.

Sales of textbooks thereafter made were not overt acts as contemplated by the charging statute. People v.

Williamson, 280 Ill. App. 93; Brown v. Elliott, 225 U. S. 392, 32 S. Ct. 812, 56 L. Ed. 1136; Ex parte Black, D. C., 147 F. 832; Feder v. United States, 2 Cir., 257 F. 694, 168 C.C.A. 644, 5 A.L.R. 370; Lonabaugh v. United States, 8 Cir., 179 F. 476, 103 C.C.A. 56.

Where the act relied upon as the basis of the local jurisdiction is not an act relating to the execution of the conspiracy, but is merely a result of a conspiracy formed and its objects effected elsewhere, the same is insufficient to extend the statute of limitation and the local jurisdiction must fail. Tillinghast v. Richards, D. C., 225 F. 226; De Luca v. United States, 2 Cir., 299 F. 741; Rose v. St. Clair, D.C., 28 F. 2d 189; United States v. Great Western Sugar Co., D. C., 39 F. 2d 152.

The Supreme Court of North Carolina in the case of State v. Mitchell, State Bank Examiner, et al., 202 N.C. 439, 163 S.E. 581, 583, in its opinion used language which very appropriately applies to the instant case.

Mitchell, State Bank Commissioner, had his offices at Raleigh, in Wake county, N. C. He and others were indicted in Buncombe county, where they were charged with conspiracy in connection with receiving deposits of money and transacting business in banks which it is alleged they knew were insolvent. These banks were located in different counties of the state, but none of them were in Wake county. A plea of abatement was filed attacking the venue in Buncombe county. This plea was sustained, the defendants were discharged, and the state appealed. In the opinion affirming the decision of the trial court, it is stated:

"The plea raises the question whether a grand jury in Buncombe county had jurisdiction or power to indict the defendants for alleged misfeasance, malfeasance, or non-feasance in the county of Wake. . . .

"With respect to the question presented, the common-law doctrine was clearly defined. 'The grand jury,' said Blackstone, 'are sworn to inquire only for the body of the county, pro corpore comitatus; and therefore they cannot regularly inquire of a fact done out of that county for which they are sworn, unless particularly enabled by an act of parliament.' 4 Com. 303. No less direct is Hawkins's Pleas of the Crown: 'But of whatsoever nature an offence indicted may be, whether local or transitory, as seditions, words, or battery, etc., it seems to be agreed, that if upon not guilty pleaded it shall appear, that it was committed in a county different from that in which the indictment was found, the defendant shall be acquitted.' C. 25, sec. 51. 'At common law, the venue should always be laid in the county where the offense is committed, although the charge is in its nature transitory, as seditions, words, or battery; and it does not lie on the prisoner to disprove the commission of the offense in the county in which it is laid, but it is an essential ingredient in the evidence on the part of the prosecution, to prove that it was committed within it.' 1 Chitty on Criminal Law, 177. The substance of this summary has been referred to in a number of our decisions. State v. Lytle, 117 N. C. 799, 23 S. E. 476; State v. Carter, 126 N.C. 1011, 35 S.E. 591; State v. Oliver, 186 N.C. 329, 119 S.E. 370.

"The orderly sequence of these propositions is the question whether this principle of the common law prevails in the courts of this state. Before the adoption of our Constitution it was declared that all such parts of the common law as were theretofore in use within the state and were not destructive of, repugnant to, or inconsistent with the freedom and independence of the state and its form of government and not otherwise provided for, abrogated, repealed, or become obsolete, were in full force within the state. This statute is now in effect. C.S. § 970. It is generally conceded that so much of the common law as is in force by virtue of this provision is subject to legislative control and may therefore be modified or repealed. But there are parts of the common law which are not subject to modification or repeal by the

Legislature because they are imbedded in the Constitution. * * *

"The facts pleaded in abatement challenged the jurisdiction of the superior court of Buncombe county for the reason that the grand jury there was without jurisdiction to indict the defendants for a breach of the criminal law averred to have been committed in the county of Wake. At common law the grand jury of the county in which the bill was found had no jurisdiction of the indictment, and we have no statute enacted by the General Assembly except as heretofore noted, 'no act of parliament,' conferring such jurisdiction. Whether such a statute, if enacted, would be sustained as an exercise of legislative power or declared invalid because in conflict with the organic law is a matter outside the scope of this discussion.

"There was no error in sustaining the plea in abatement. The effect of the judgment is to terminate any further action or prosecution on the indictment found in Buncombe county and to discharge the defendants."

If the foregoing were not conclusive, it is apparent from the record and the provisions of Senate Bill No. 16, Chapter 28, Session Laws 1941, 70 O. S. 1941 §§ 974, 975, 980, 981, 985a, 991a, 991b, that new adoptions were made in 1939 by the Textbook Commission and thereafter all books sold were those included in this 1939 adoption or under the 1941 statute. We approve and affirm the ruling of the trial court on this question, which is in part as follows:

"The conspiracy, of course, as alleged, and as it existed under the evidence before the grand jury, was back in 1937 and 1938. There is some evidence to show that the conspirator A. L. Crable, as late as 1939 and 1940, endeavored to continue the conspiracy, but the overt acts alleged in the indictment are not overt acts under the law, because of the subsequent adoption by the Textbook Commission and because, particularly, of the acts

of the Legislature of 1941. The act of the Legislature of 1941 places the stamp of legality upon those overt acts alleged in the indictment in Tulsa County, which happened in Tulsa County within the three years last past. The court, therefore, finds that, as a matter of law, Tulsa County does not have jurisdiction of this conspiracy; that the venue is not here and the motion to quash is good on that ground."

Because of the conclusion reached that the prosecution of the offense charged was barred by the statute of limitations and that the venue did not lie in Tulsa county, it is unnecessary to decide other questions.

The judgment of the district court of Tulsa county, quashing and setting aside the indictment as to each and all defendants is affirmed.

BAREFOOT, P. J., concurs. JONES, J., concurs in conclusion.